

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00233-CR

_____

RICKY GILMORE, SR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 349th Judicial District Court
Houston County, Texas
Trial Court No. 09CR-076

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

The January 2009 anonymous tip that ultimately led to the conviction of Ricky Gilmore, Sr., in a Houston County[1] jury trial for possession of a controlled substance with intent to deliver, came in a telephone call to Houston County Deputy H. D. Gresham. Without divulging how he or she had come by the information, the tipster told Gresham that Gilmore had just left Trinity County traveling to Houston County in a white Dodge truck and was concealing drugs "in his ass." Gresham asked Deputy Clayton Smith to accompany him in his attempt to locate Gilmore. The deputies were aware that Gilmore had outstanding child support warrants.

While traveling down State Highway 19 toward Trinity County, Gresham and Smith observed Gilmore, with whom they were acquainted, pass them traveling in the opposite direction in a vehicle matching the description given by the tipster. The deputies stopped Gilmore and arrested him on the child support warrants. The deputies conducted a pat down search of Gilmore and an inventory search of the vehicle, but found no drugs or drug paraphernalia. They did find $364.00 cash in Gilmore's possession.

At the Houston County jail, Smith conducted a visual body-cavity search of Gilmore, requiring Gilmore to remove all his clothing, lift his scrotum, and spread his butt cheeks. The officers discovered, under Gilmore's scrotum and partially concealed in Gilmore's anus, a bag

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

containing a substance later identified as containing forty-one grams of cocaine, including adulterants.

The anonymous caller then called Gresham again and stated that Gilmore had been selling drugs from his residence. The deputies obtained a search warrant for the residence and there discovered glassine bags and two sets of digital scales.

The jury found Gilmore guilty and assessed punishment at seventy-five years' imprisonment. The trial court sentenced Gilmore consistent with the jury's assessment. Gilmore appeals, raising four issues. We affirm the judgment of the trial court, because we hold that (1) the visual body-cavity search of Gilmore's person was reasonable, (2) probable cause supported the search of Gilmore's residence, (3) any error in refusing Gilmore a continuance was not preserved, and (4) insufficient causal connection was established to permit impeaching Gresham with federal charges.

*(1)     The Visual Body-Cavity Search of Gilmore's Person Was Reasonable*

Gilmore argues that the trial court erred in denying his motion to suppress evidence seized during the visual body-cavity search because the deputies lacked reasonable suspicion to conduct the search incident to arrest. The State argues the balancing of the four factors of *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), indicates the search was reasonable.

In general, a search incident to arrest authorizes the police to conduct "a full search of the person." *United States v. Robinson*, 414 U.S. 218, 236 (1973). "But Robinson did not do away

with the requirement that all searches be reasonable, nor did it hold that all searches incident to arrest, no matter how intrusive, are per se reasonable." *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). Whether a search is reasonable "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559 (concluding searches in jails and prisons can be conducted with less than probable cause).

We are to consider four factors in determining the reasonableness of the search: (1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted. *Id.*; *see McGee*, 105 S.W.3d at 616. Each analysis will depend on the particular facts and circumstances of the underlying case, and no one factor is determinative. *McGee*, 105 S.W.3d at 616.

*(a)     The Scope of the Intrusion Weighs Against Reasonableness*

The search of Gilmore's person conducted in this case is sometimes called a strip search in the briefs of the parties and at trial. But it is properly called a "visual body-cavity search."

> The term "strip search" generally refers to an inspection of a naked person, without any scrutiny of the person's cavities. A "visual body-cavity search" includes a visual inspection of a person's anal or genital areas. A "manual body-cavity search" involves some degree of probing or touching a person's body cavities.

*Id.* at 615. Because the search at issue included a visual inspection of Gilmore's anal and genital areas, the search was a visual body-cavity search. The Texas Court of Criminal Appeals has noted "[v]isual body-cavity searches are among the most intrusive of searches" and their intrusiveness "cannot be overstated." *Id.* at 616 (quoting *Kennedy v. Los Angeles Police Dep't*,

4

901 F.2d 702, 711 (9th Cir. 1989)). Visual body-cavity searches can be demeaning, dehumanizing, terrifying, and humiliating. *Id*. This factor clearly weighs against the reasonableness of the search and requires the other factors, on balance, to justify the search.

(b)      *How the Search Was Conducted Favors Reasonableness*

The record indicates the visual body-cavity search was conducted in a professional manner with no more intrusion than necessary. The deputies escorted Gilmore to a room in the book-in area of the Houston County jail, which the deputies referred to as the "strip-search area." Once there, the deputies ordered Gilmore to remove his clothes and then inspected the clothes. The deputies then advised Gilmore to "turn and face [the deputies] and lift his scrotum and turn and spread his butt cheeks . . . ." When Smith observed "something being concealed," he asked Gilmore to remove the item; Gilmore eventually complied. There are no allegations the deputies required Gilmore to remain exposed for unreasonable durations, subjected Gilmore to endure degradation or ridicule, or conducted the search based on any abusive or unprofessional motivation on the part of the deputies. This factor weighs in favor of reasonableness.

(c)      *The Justification for the Search Favors Reasonableness*

The third factor concerns the justification the deputies had for the search. That involves the level of suspicion the deputies had that a search would yield either contraband or a weapon. Although a pretrial detainee has a diminished expectation of privacy while at a jail—the location of this search—there is some debate about the appropriate level of suspicion for such a search.

Gilmore argues that the trial court erred in denying his motion to suppress evidence seized during the visual body-cavity search because the deputies lacked reasonable suspicion to conduct the search. He explains that Article 38.23 of the Texas Code of Criminal Procedure requires the exclusion of the evidence because (a) the lack of reasonable suspicion violated the United States Constitution, (b) the lack of reasonable suspicion violated the Houston County jail's search policy,[2] and (c) the lack of reasonable suspicion violated the Texas Administrative Code.[3]

[2]The search policy of the Houston County jail states that an unclothed search is "[a] search where reasonable suspicion exists to justify the search." According to Gilmore, the search should have been suppressed because the deputies lacked specific, articulable facts that Gilmore possessed a controlled substance. Gilmore's argument relies on the definition of "reasonable suspicion" that applies to Fourth Amendment purposes, rather than the definition of the term in the policy. The policy, though, assigned a different definition to the term "reasonable suspicion" than the definition of the term for the purpose of a Fourth Amendment analysis. Section 1.08 of the policy provides reasonable suspicion exists if "the individual's criminal history shows previous arrests for drug offense . . . ." The record reflects that the deputies were aware Gilmore had been previously arrested for drug offenses.

A departmental policy, however, is merely a guide to assist the employees of the department; it is not a law or a regulation. A policy is "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future actions." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 960 (11th ed. 2003). Although a policy might have relevance in some situations, it has no relevance to the admissibility of evidence under Article 38.23. It is a guide to aid the department's employees in complying with the department's preferred course of action. While often used to aid a department in complying with the law, a policy is still nothing more than a guide. A policy does not modify or expand the law. A policy is not a law of the State of Texas under Article 38.23.

[3]The Texas Commission on Jail Standards has issued a regulation concerning searches on admittance. Section 265.2 of Title 37 of the Texas Administrative Code provides as follows in pertinent part:

> (a)      A thorough pat or frisk search shall be conducted on each inmate upon entry into the facility and prior to booking.
> (b)      When facility personnel reasonably believe it to be necessary, inmates should undergo a thorough strip search for weapons and contraband which may pose a threat to the security or safety of the facility . . . .

37 TEX. ADMIN. CODE § 265.2 (2010). Gilmore argues, because the deputies lacked reasonable suspicion, they could not "reasonably believe" a search was necessary. Thus, according to Gilmore, the search violated the Texas Administrative Code and the prohibition contained in Article 38.23 applies to the search.

In general, a valid regulation adopted by an administrative agency in accordance with its delegated powers has the force and effect of a legislative enactment. *Ne. Tarrant County Water Auth. v. Bd. of Water Eng'r*, 367

6

In *Bell*, the United States Supreme Court announced, due to the "significant and legitimate security interests" of penal institutions, visual body-cavity searches may be conducted based on less than probable cause. *Bell*, 441 U.S. at 560. The Court, though, failed to specify what level of suspicion is necessary, if any. The Texas Court of Criminal Appeals, similarly, has yet to specify what level of suspicion, if any, is required for visual body-cavity searches. *McGee*, 105 S.W.3d at 617. *McGee* upheld a visual body-cavity search conducted in a fire station, not a jail, as a search incident to arrest but, in deciding the search was reasonable, noted the police had probable cause. *Id*. *McGee* endorsed the four-part weighing test set out by *Bell* and explicitly stated that no single factor of the test is determinative. *Id*. at 616. If, as is stated by *McGee*, a single factor cannot be determinative, then no particular level of suspicion, not even reasonable suspicion, can be said to be an absolute requirement to validate a search.

Notwithstanding the lack of an absolute standard requiring reasonable suspicion, we believe the deputies had reasonable suspicion to search Gilmore. We review the trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review deferring to the trial court's determination of historical facts that depend on credibility, but reviewing de novo the trial court's application of the law. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App.

S.W.2d 720, 723 (Tex. Civ. App.—Austin 1963, no writ); *see* 25–421 *Dorsaneo*, TEXAS LITIGATION GUIDE § 421.02 (2010); *B-R Dredging Co. v. Rodriguez*, 564 S.W.2d 693, 696 (Tex. 1978). However, the issue of whether the general rule applies under the circumstances presented in this case is not clear. Neither Gilmore nor the State have briefed whether the Texas Legislature contemplated that Article 38.23 would apply to violations of agency regulations or whether "reasonably believed" is consistent with or more expansive than reasonableness under the Fourth Amendment. Because the deputies had reasonable suspicion, it is not necessary for us to decide this issue.

2007); *see Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial court's evidentiary ruling "will be upheld on appeal if it is correct on any theory of law that finds support in the record." *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006). Generally, we review de novo determinations of reasonable suspicion and probable cause after granting deference to the trial court's determination of historical facts. *Guzman*, 955 S.W.2d at 87.

An anonymous telephone call rarely will, standing alone, establish the requisite level of reasonable suspicion because "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Alabama v. White*, 496 U.S. 325, 329 (1990); *see Florida v. J.L.*, 529 U.S. 266, 270 (2000). Only an anonymous tip, suitably corroborated or otherwise exhibiting sufficient indicia of reliability, will provide reasonable suspicion for a temporary or investigative detention. *See J.L.*, 529 U.S. at 270. Police can provide other indicia of reliability by independent corroboration of the informant's information. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983); *Cassias v. State*, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986) (op. on reh'g). "Corroboration by the police officer means that, in light of the circumstances, the officer confirms enough facts to reasonably conclude that the information provided is reliable . . . ." *Jones v. State*, 949 S.W.2d 509, 515 (Tex. App.—Fort Worth 1997, no writ).

In general, corroboration of mere innocent details is insufficient to corroborate an anonymous tip. *Davis v. State*, 144 S.W.3d 192, 199–200 (Tex. App.—Fort Worth 2004, pet. ref'd). The independent corroboration by the police must establish that the anonymous tip is

8

"reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 271. "[T]he corroboration of details that are easily obtainable at the time the information is provided, and which do not indicate criminal activity, will not lend support to the tip." *Stewart v. State*, 22 S.W.3d 646, 648 (Tex. App.—Austin 2000, pet. ref'd); *see J.L.*, 529 U.S. at 272; *Johnson v. State*, 146 S.W.3d 719, 721 (Tex. App.—Texarkana 2004, no pet.); *Davis v. State*, 989 S.W.2d 859, 861 (Tex. App.—Austin 1999, pet. ref'd); *Parish v. State*, 939 S.W.2d 201, 204 (Tex. App.—Austin 1997, no pet.); *Correll v. State*, 696 S.W.2d 297, 299 (Tex. App.—Fort Worth 1985, writ ref'd). The United States Supreme Court, though, has recognized an exception when the anonymous tip correctly predicts future movements of the suspect. *See White*, 496 U.S. at 332; *Gates*, 462 U.S. at 245. The Court reasoned:

> Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.

*White*, 496 U.S. at 332. Both *Gates* and *White*, however, involved unusual travel itineraries. When the travel itinerary is more commonplace, knowledge of a suspect's travel plans may not be sufficient. *See, e.g.*, *Smith v. State*, 58 S.W.3d 784, 793 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (finding no reasonable suspicion for various reasons, including that travel was down "well traveled corridor"). The question is whether, under the totality of the circumstances, "an informant's tip contains a range of details relating not only to easily obtained facts and conditions existing at the time of the tip, but also to future actions of third parties ordinarily not easily

9

predicted." *Id.* at 789 (citing *Gates*, 462 U.S. at 245).

The corroboration that Gilmore was traveling toward Houston County in a white Dodge pickup truck was not sufficient, by itself, to create reasonable suspicion. The travel was down a well traveled corridor, which was the usual route between Crockett and Trinity, and the tip merely predicted Gilmore's current course of travel, not his future travel itinerary. The United States Supreme Court has noted:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*J.L.*, 529 U.S. at 272 (citations omitted). At trial, Gresham testified the anonymous caller advised him "Ricky Gilmore had just left Trinity County . . . ." As made clear in Gresham's trial testimony,[4] the anonymous tip in this case did not predict Gilmore's future travel plans, but only described Gilmore's current travel plans. As such, the exception for correctly predicting future travel plans does not apply. Although the corroboration is still relevant to the anonymous caller's reliability, it is not sufficient corroboration by itself.

---

[4]The testimony of the deputies at trial differed in a number of minor respects from their testimony at the pretrial hearing. In reviewing a trial court's decision concerning a motion to suppress, we generally consider only evidence adduced at the suppression hearing, since the ruling was based on that evidence, rather than evidence introduced later in the trial. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). When the legality of the seizure is relitigated at trial, however, consideration of relevant trial testimony is appropriate in our review. *Id.* In this case, the issue was relitigated at trial and presented to the jury in the court's charge. Therefore, we will consider the testimony introduced at trial in our analysis.

10

The corroboration that Gilmore was traveling toward Houston County in a white Dodge truck was not the only indicia of reliability known to the deputies. Although the deputies knew Gilmore had previously been arrested for drug offenses, it is not clear whether they knew if Gilmore had any prior convictions.[5] The deputies had also received a tip from a named informant that Gilmore was selling drugs. Several weeks previously, another deputy had received a statement from a named informant who stated, "I go to the trailer behind Jan's to purchase crack cocaine. I gave the money to Jesse McKnight and he goes to the back door to get the dope from Ricky Gilmore. This occurs in Crockett, Texas."

While none of the information known to the deputies would have been sufficient by itself to create reasonable suspicion, the information was sufficient when considered together. We conclude the anonymous tip, corroborated by Gilmore's current course of travel, considered with the tip from a named informant and Gilmore's arrest record was sufficient under the totality of the circumstances to create reasonable suspicion.

The justification for the search favors reasonableness.

*(d)      Where the Search Was Conducted Favors Reasonableness*

The Texas Court of Criminal Appeals has held "the search must be conducted in a hygienic environment where there is no risk of infection." *McGee*, 105 S.W.3d at 617. The search was conducted in a room in the book-in area of the Houston County jail which the deputies referred to

---

[5]A person's arrest record may be considered along with other specific, articulable facts in determining whether reasonable suspicion exists. *See Coleman v. State*, 188 S.W.3d 708, 719 (Tex. App.—Tyler 2005, pet. ref'd). Of course, knowledge that Gilmore had been convicted of prior drug offenses would be considerably more persuasive.

as the "strip-search area." Although the search was not conducted in a location as sterile as a hospital, the search did not involve any probing of body cavities. In *McGee*, the Texas Court of Criminal Appeals suggested that, when there is no penetration of the body, a less sterile environment may be satisfactory. This is not to say visual body-cavity searches may be conducted in unsanitary conditions, but merely that the location does not have to be as sterile as a hospital when no penetration is involved. We conclude the place where the search was conducted was reasonable.

Three of the four factors favor a finding of reasonableness. Like the situation in *McGee*, the only factor that weighs against reasonableness is the intrusiveness of the search. Balancing the need for the particular search against the invasion of personal rights, we conclude that the visual body-cavity search was reasonable.

We overrule this contention.

*(2)     Probable Cause Supported the Warrant to Search Gilmore's Residence*

Gilmore also contends that the trial court erred in denying his motion to suppress evidence discovered during the search of his residence. The Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution guarantee the right of the people to be secure against unreasonable searches of their persons, houses, papers, and effects. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. After discovering the cocaine during the visual body-cavity search, the deputies obtained a search warrant authorizing a search of Gilmore's

12

residence. They discovered glassine bags and electronic scales. Gilmore complains that the affidavit used to apply for the warrant fails to allege sufficient facts to establish probable cause.

As an exception to the general rule articulated in *Guzman*, the issuing magistrate's decision to grant the search warrant should be reviewed with a deferential standard of review. *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004). Great deference should be paid to a magistrate's determination of probable cause, and warrants should not thereafter be invalidated through "hypertechnical" interpretation of their supporting affidavits. *Gates*, 462 U.S. at 236. Affidavits for arrest or search warrants should be interpreted in a commonsense and realistic manner. *Gibbs v. State*, 819 S.W.2d 821, 830 (Tex. Crim. App. 1991). Granting great deference to the issuing magistrate's determination, the appellate court will sustain the issuance of the warrant if the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Gates*, 462 U.S. at 236; *see Swearingen*, 143 S.W.3d at 811.

An application for a search warrant must be supported by an affidavit setting forth facts establishing probable cause. TEX. CODE CRIM. PROC. ANN. art. 1.06 (Vernon 2005), art. 18.01(b) (Vernon Supp. 2009). The determination of the sufficiency of an arrest or search warrant is limited to the four corners of the affidavit. *Oubre v. State*, 542 S.W.2d 875, 877 (Tex. Crim. App. 1976); *Burke v. State*, 27 S.W.3d 651, 654 (Tex. App.—Waco 2000, pet. ref'd). The facts contained in the probable cause affidavit must be sufficient to justify a conclusion that the object of the search is probably on the premises at the time the warrant is issued. *State v. Delagarza*, 158

S.W.3d 25, 26 (Tex. App.—Austin 2005, no pet.). The warrant must contain "sufficient information" to allow the issuing magistrate to determine probable cause because the magistrate's action "cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239.

Because probable cause is determined from the "four corners" of the affidavit alone, there are no credibility choices to be made by the trial court in determining whether the issuing magistrate had a substantial basis to conclude that probable cause existed. *Burke*, 27 S.W.3d at 654. Thus, we review de novo the trial court's ruling on the motion to suppress. *Id.*

The search of Gilmore's residence cannot be justified merely on the fact that Gilmore was found to possess drugs or that Gilmore was a drug dealer. "[I]t is not enough to simply conclude that contraband is in one's home merely because the suspect has a home." *Taylor v. State*, 54 S.W.3d 21, 27 (Tex. App.—Amarillo 2001, no pet.) (finding warrant for search of suspect's residence invalid); *see State v. Ozuna*, 88 S.W.3d 307, 313 (Tex. App.—San Antonio 2002, pet. ref'd). There must be probable cause that drugs would be found at the residence.

The deputies had information which indicated drugs would be found at Gilmore's residence. The probable cause affidavit in this case provides as follows, in pertinent part:

> A.     On January 14, 2008[,] Your Affiant received information from an anonymous source who stated that Ricky Gilmore was traveling from Trinity, TX to Crockett, TX on State Hwy 19 driving a white 1990s model Dodge truck. The source stated that the subject was going to have in his possession a quantity of cocaine that he had picked up in Trinity, TX. The source also explained to your affiant that Gilmore would be carrying the cocaine between his scrotum and anus.
>
>      . . . .

14

C.      Your Affiant located a white Dodge pick-up truck traveling northbound on State Hwy 19.  The truck was a 1996 Dodge displaying Texas license plate 24PDX8.  Deputy Smith positively identified that Ricky Lane Gilmore was the driver of the truck.

        . . . .

I.      Once at the jail[,] a strip search was conducted which is common operating procedure for suspects that have a prior arrest record for narcotics and for person[s] suspected of concealing narcotics on there [sic] person.   During the strip search[,] Deputy Smith located a foreign object underneath Gilmore's scrotum and between his anus.   When asked to remove the object[,] Gilmore hesitated but then complied and removed a clear plastic sandwich type bag that contained a white powdery substance believed to be cocaine.

J.      A field test of the substance showed positive for cocaine and the unofficial weight of the substance and the packaging is approximately forty-two grams.

K.      At approximately 11:45AM[,] your affiant received a telephone call from the anonymous source again who wanted to know if Gilmore had been caught. The source stated that Gilmore had bragged to him about making ten thousand dollars a week from the sales of cocaine, and the informant stated that Gilmore was known to keep illegal narcotics and United States currency derived from the sale of narcotics on his property, and inside his residence located at 110 Cypress street in Crockett, TX.

L.      On December 29, 2008[,] Deputy Massingill received a hand written witness statement from Emil James Moser[,] a thirty eight year old male who had information about Gilmore.   In Moser[']s statement he writes[,] "I go to the trailer behind Jan's grocery to purchase crack cocaine.  I give the money to Jesse McKnight and he goes to the back door to get the dope from Ricky Gilmore.   This occurs in Crockett, TX.

M.      Your Affiant has known Gilmore to sell cocaine and has been selling cocaine for several years. Gilmore's criminal history shows arrest for Manufacture/ Delivery/Possession of Controlled Substance less than 28 grams, Cocaine possession, Possession of Controlled substance penalty group 1 less than one gram,

and driving while license invalid.

Thus, the probable cause affidavit includes two tips, one from an anonymous informant and one from a named informant, that drugs would be found at Gilmore's residence.

Because of the potential unreliability of statements given by anonymous informants, the United States Supreme Court developed the *Aguilar-Spinelli* analysis, which required a two-pronged test asking whether (1) the informant obtained the relevant information in a reliable manner, and (2) the informant was reliable. *See Gates*, 462 U.S. at 230. In response to "hypertechnical" interpretations of the *Aguilar-Spinelli* analysis, the United States Supreme Court subsequently relaxed the rigid standards in the *Aguilar-Spinelli* analysis to allow consideration of the totality of the circumstances. *See id.* Because the focus of inquiry is whether the statements are sufficiently reliable for a finding of probable cause, a deficiency in one of the two factors of reliability of the informant may not be fatal if the totality of the circumstances indicates reliability. *Id.* The totality of the circumstances includes the "veracity," "reliability," and the "basis of knowledge" of the informant and the informant's information. "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Id.* *Gates* "did not dispense with the two requirements used in the *Aguilar-Spinelli* test. Rather, the United States Supreme Court simply held that the prongs should not be applied too rigorously, and the entire affidavit should be examined to determine whether, as a whole, probable cause is established." *Ware v. State*, 724 S.W.2d 38, 40 (Tex. Crim. App. 1986).

16

There are a number of concerns with the probable cause affidavit in this case. The anonymous tip fails to provide much information on either the veracity or reliability of the informant. The discovery of drugs during the visual body-cavity search indicates the source is reliable, but does not alleviate the concerns about the basis of knowledge of the informant. The tip fails to provide any information about how the informant obtained the information. The anonymous tip merely states, "Gilmore was known to keep illegal narcotics . . . inside his residence." The tip fails to specify how the anonymous source learned the narcotics were at the residence. The phrase "was known" is clearly insufficient, by itself, to establish the basis of knowledge of the anonymous call.

The tip from the named informant also lacks any information concerning the basis of the knowledge.[6] The named informant stated, "I give the money to Jesse McKnight and he goes to the back door to get the dope from Ricky Gilmore." This tip fails to specify how the named informant knew the drugs were kept at Gilmore's residence. Did the named informant personally observe McKnight go to Gilmore's residence, or did the named informant merely presume that is

---

[6]The tip from the named informant was made to the deputies several weeks before the search of Gilmore's residence. It is well established that a search warrant cannot be issued based on facts which occurred at too remote a time. *See Garza v. State*, 120 Tex. Crim. 147, 48 S.W.2d 625, 626 (1932); *Serrano v. State*, 123 S.W.3d 53, 60 (Tex. App.—Austin 2003, pet. ref'd). A probable cause affidavit is "inadequate if it fails to disclose facts which would enable the magistrate to ascertain from the affidavit that the event upon which the probable cause was founded was not so remote as to render it ineffective." *Sherlock v. State*, 632 S.W.2d 604, 608 (Tex. Crim. App. 1982) (citing *Garza*, 48 S.W.2d at 627–28). On the other hand, the issue of staleness becomes less of a concern when the information known to the police shows a continuing course of conduct. *See Bernard v. State*, 807 S.W.2d 359, 365 (Tex. App.—Houston [14th Dist.] 1991, no pet.); *see also Bills v. State*, 855 S.W.2d 79, 82 (Tex. App.—Fort Worth 1993, no pet.). We conclude the tips in this case are sufficient to conclude Gilmore was engaging in a continuing course of conduct. Therefore, the concerns about the tip from the named informant being stale are alleviated.

17

where McKnight went? A named informant's declarations against the informant's own penal interest may be used to corroborate the reliability of information in an affidavit. *Abercrombie v. State*, 528 S.W.2d 578, 583–85 (Tex. Crim. App. 1974) (op. on reh'g); *Barton v. State*, 962 S.W.2d 132, 143 (Tex. App.—Beaumont 1997, pet. ref'd). Although the named informant's admissions against the informant's own penal interests may corroborate the named informant's reliability, the named informant's veracity is still suspect. The deputies lacked any information about how the named informant knew drugs were kept at Gilmore's residence.

Despite these shortcomings, the tip from the named informant provides additional indicia of reliability to the anonymous call. In addition, the deputies knew Gilmore had previously been arrested for drug offenses and had been found in possession of cocaine only a few hours earlier. We are to afford great deference to the issuing magistrate. Whether we would have found probable cause under the facts presented in the probable cause affidavit, our review is concerned only with whether there is a substantial basis for the issuing magistrate to find probable cause existed. While the anonymous tip was deficient concerning both veracity and reliability, these deficiencies were compensated for by other indicia of reliability. The deputies had received a tip from a named informant that was consistent with the anonymous tip. In addition, the deputies knew that Gilmore had been arrested for drug offenses in the past. Finally, the first tip from the anonymous tipster had proven to be correct by the visual body-cavity search. Under the totality of the circumstances, the anonymous tip, considered with the other indicia of reliability, was

sufficient to provide the issuing magistrate a substantial basis to conclude probable cause existed.

We overrule this contention.

*(3)     Any Error in Refusing Gilmore a Continuance Was Not Preserved*

Gilmore also argues that the trial court erred in denying a motion for continuance made by an attorney his family had retained a week before trial.   The motion was presented orally to the trial court the day of trial, immediately preceding voir dire.   The State responds that the trial court did not abuse its discretion.

First, the error, if any, is not preserved for our review.   A motion for continuance made during trial that is not in writing and is not sworn to will not preserve error if it is denied. *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009); *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995); *see* TEX. CODE CRIM. PROC. ANN. arts. 29.03, 29.08 (Vernon 2006).   The record in this case does not contain any written motion requesting a continuance so that Gilmore's newly retained counsel could represent him.[7]   The request for a continuance made by Gilmore's newly retained counsel was made orally to the trial court.   The issue raised by Gilmore on appeal is not preserved for appellate review.

Even if error had been preserved, Gilmore has failed to show the trial court abused its discretion.   A criminal defendant has a right to secure counsel of his or her own choice. *United*

---

[7]The record contains a written motion for continuance filed by Gilmore's appointed counsel which requests a continuance because Gilmore had ceased discussing the case with his appointed counsel on learning his family had retained another attorney to represent him.   This motion, though, does not request a continuance on behalf of the newly retained attorney.

19

*States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45 (1932). The United States Supreme Court, though, specifically acknowledged the right "is circumscribed in several important respects." *Gonzalez-Lopez*, 548 U.S. at 144 (quoting *Wheat*, 486 U.S. at 159). A defendant cannot wait until the day of trial to demand different counsel or to request that counsel be dismissed so that he or she may retain other counsel. *Neal v. State*, 689 S.W.2d 420, 427 (Tex. Crim. App. 1984); *Ramirez v. State*, No. 2-09-136-CR, 2010 Tex. App. LEXIS 3663, at *20–21 (Tex. App.—Fort Worth May 13, 2010, no pet. h.) (mem. op., not designated for publication).

The Texas Court of Criminal Appeals has announced several factors which trial courts may consider in deciding whether to grant a continuance, including:

> (1) the length of the delay requested, (2) whether other continuances were requested and whether they were denied or granted, (3) the length of time in which the accused's counsel had to prepare for trial, (4) whether another competent attorney was prepared to try the case, (5) the balanced convenience or inconvenience to the witnesses, the opposing counsel, and the trial court, (6) whether the delay is for legitimate or contrived reasons, (7) whether the case was complex or simple, (8) whether a denial of the motion resulted in some identifiable harm to the defendant, (9) the quality of legal representation actually provided.

*Ex parte Windham*, 634 S.W.2d 718, 720 (Tex. Crim. App. 1982); *see Rosales v. State*, 841 S.W.2d 368, 375 (Tex. Crim. App. 1992). "In addition to all of these factors, it must be remembered that the public interest in the fair and orderly administration of justice may be greater than a defendant's right to have counsel of his choice." *Id.* Although the trial court had

20

scheduled the trial date approximately three months before the date of trial, Gilmore's counsel of choice was not retained until the week before trial. Gilmore's newly retained counsel first orally requested a ninety-day continuance. After the trial court denied the substitution of counsel, Gilmore's newly retained counsel orally requested a sixty-day continuance, which the trial court also denied. The State represented to the court that it did not have any other cases ready for trial on that day. Even if this issue had been preserved for review, the trial court did not abuse its discretion.

We overrule this contention.

*(4)      Insufficient Causal Connection Was Established to Permit Impeaching Gresham with Federal Charges*

Gilmore also asserts the trial court erred in refusing to permit Gilmore to impeach Gresham based on pending criminal charges that had been filed against Gresham in federal court. Gresham received the initial anonymous tip and assisted in the investigation of Gilmore. Gresham had been charged with a violation of civil rights and entered a plea agreement in which he agreed to plead guilty to simple assault. Gresham was awaiting sentencing on the plea agreement. The trial court refused to permit the impeachment evidence to be introduced.

Gilmore cites *Maxwell v. State*, 48 S.W.3d 196, 200 (Tex. Crim. App. 2001), o*verruled to the extent it conflicts with Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998), *by Irby v. State*, No. PD-1097-08, 2010 Tex. Crim. App. LEXIS 725 (Tex. Crim. App. June 16, 2010),

21

in support of his argument.[8]   The State argues Gilmore failed to establish a causal connection between the pending charges in federal court and a bias or motive to testify favorably for the State.

Impeachment based on proof of circumstances showing bias is permitted unless the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.   *See* TEX. R. EVID. 403, 613; *see also Davis v. Alaska*, 415 U.S. 308 (1974) (right to confront witnesses includes right to cross-examine witnesses concerning their possible bias, self-interest, or motives in testifying); *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009).   The Texas Court of Criminal Appeals has held that the existence of an express agreement between the witness and the State is not determinative of whether pending charges reveal bias.   *Carroll v. State*, 916 S.W.2d 494, 500 (Tex. Crim. App. 1996).   The proponent of the impeachment evidence, however, "must establish some causal connection or logical relationship between the pending charges and the witness' 'vulnerable relationship' or potential bias or prejudice for the State, or testimony at trial."   *Carpenter*, 979 S.W.2d at 634.   The facts in *Carpenter* were similar to this case.   The Texas Court of Criminal Appeals held there was no causal connection between the existence of pending federal charges and the witness' testimony at trial.   As in *Carpenter*, Gilmore has failed to establish a causal connection between the pending federal charges and Gresham's testimony at trial.   At trial, Gilmore argued, because Gresham's presentence investigation report had not been completed, Gresham had a motive to be biased toward the State. This argument is the equivalent of the mere existence of federal charges and fails to establish a

[8]The Texas Court of Criminal Appeals issued its opinion in *Irby* after the parties had filed their briefs in this case.

22

nexus or causal connection indicating bias. The trial court did not err in refusing to permit the impeachment of Gresham.

For the reasons stated, we affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice

Date Submitted:      July 6, 2010
Date Decided:       August 12, 2010

Publish

23